1  DAVID M. POITRAS P.C. (State Bar No. 141309)
   THOMAS M. GEHER (State Bar No. 130588)
2  CAROLINE R. DJANG (State Bar No. 216313)
   JEFFER, MANGELS, BUTLER & MARMARO LLP
3  1900 Avenue of the Stars, Seventh Floor
   Los Angeles, California  90067-4308
4  Telephone:     (310) 203-8080
   Facsimile:      (310) 203-0567
5
   Counsel for Bradley D. Sharp, Chapter 11 Trustee
6  for Namco Capital Group, Inc.

7                    UNITED STATES BANKRUPTCY COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9                        LOS ANGELES DIVISION

10

11  In re:                                    Case Number: 2:08-bk-32333-BR

12                                            Chapter 11

13  NAMCO CAPITAL GROUP, INC., a California
    corporation,                             **NOTICE OF MOTION AND MOTION OF**
14                                            **BRADLEY D. SHARP, CHAPTER 11**
                                             **TRUSTEE FOR THE ESTATE OF NAMCO**
15              Debtor.                       **CAPITAL GROUP, INC., FOR ORDER**
                                             **AUTHORIZING ASSUMPTION AND**
16                                            **ASSIGNMENT OF REAL PROPERTY**
                                             **LEASE, FREE AND CLEAR OF LIENS,**
17                                            **CLAIMS, INTERESTS AND**
                                             **ENCUMBRANCES [1929 PICO**
18                                            **BOULEVARD]; MEMORANDUM OF**
                                             **POINTS AND AUTHORITIES; AND**
19                                            **DECLARATION OF BRADLEY D. SHARP**
20
                                             Hearing:
21                                            Date:        May 12, 2010
                                             Time:        10:00 a.m.
22                                            Judge:       Courtroom 1668
                                                          255 East Temple Street
23                                                         Los Angeles, CA 90012
24

25

26  **TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE,**

27  **AND INTERESTED PARTIES:**

28

JMBM | Jeffer Mangels
       Butler & Marmaro LLP

1    **PLEASE TAKE NOTICE** that on May 12, 2010 at 10:00 a.m., or as soon thereafter as the

2    matter can be heard, before the Honorable Barry Russell, United States Bankruptcy Judge, in

3    Courtroom 1668, located at 255 East Temple Street, Los Angeles, CA, the Bankruptcy Court will

4    consider the *Motion of Bradley D. Sharp (the "Trustee"), Chapter 11 Trustee for the Estate of*

5    *Namco Capital Group, Inc. ("Debtor" or "Namco") for an Order Authorizing the Assumption and*

6    *Assignment of a Lease of Real Property, Free and Clear of Liens, Claims, Interests and*

7    *Encumbrances [1929 Pico Boulevard]* (the "1929 Pico Lease Motion" or "Motion").  Set to be

8    heard at the same time as the Lease Motion is the *Motion of Bradley D. Sharp (the "Trustee"),*

9    *Chapter 11 Trustee for the Estate of Namco Capital Group, Inc. ("Debtor" or "Namco") for an*

10   *Order Authorizing Sale of Property of the Estate, Free and Clear of Liens, Claims, Interests and*

11   *Encumbrances [1929 Pico Boulevard]* (the "1929 Pico Sale Motion").  The 1929 Pico Lease

12   Motion is a companion motion to the 1929 Pico Sale Motion and merely seeks an order of the

13   Bankruptcy Court authorizing the Trustee to assume the existing lease for the 1929 Pico Boulevard

14   Property under which Namco is the lessor and assign such lease to the Successful Bidder of the

15   underlying real estate pursuant to the 1929 Pico Sale Motion.   The 1929 Pico Lease Motion is

16   based upon this Notice and the Motion, the accompanying Memorandum of Points and Authorities,

17   the accompanying declaration of Bradley D. Sharp, and any additional evidence and argument that

18   may be submitted at or before the hearing on the Motion.

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER

6964820v1

2

1      **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f),

2   any opposition to the Motion must be filed with the Bankruptcy Court and served on counsel for the

3   Trustee no later than 14 days before the date designated for hearing on the Motion.  Pursuant to

4   Local Bankruptcy Rule 9013-1(h), the failure to file and serve timely a response to the Motion may

5   be deemed by the Court to be consent to the granting of the Motion.

6

7   Date:  April 21, 2010                          JEFFER, MANGELS, BUTLER & MARMARO LLP

8

9                                           By:    /s/ David M. Poitras
                                                 _____
10                                               DAVID M. POITRAS P.C.
                                                 Counsel for Bradley D. Sharp,
                                                 Chapter 11 Trustee for Namco Capital Group, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to the administration of the debtor's bankruptcy estate and is accordingly a core matter pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Sections 105(a), 363 and 365 of title 11, United States Code (the "Bankruptcy Code") and Rules 6004, 9006 and 9019 of the Federal Rules of Bankruptcy Procedure ("FRBP").

### II.

### SUMMARY OF RELIEF REQUESTED

Pursuant to the 1929 Pico Sale Motion (Docket No. 768), the Trustee is seeking Court approval to sell property of the Debtor's estate consisting of that certain real property and improvements thereon commonly known as 1929 Pico Boulevard, Los Angeles, California (the "Property"), free and clear of all liens, claims, interests and encumbrances, to Rexford Industrial Realty and Management, Inc. (or its assignee)("Buyer"), or to such other qualified purchaser who makes a higher and better offer ("Successful Bidder"), for the sum of $3,000,000 (the "Purchase Price").

The Property is leased by Namco to Loomis, Fargo & Co. ("Lessee") pursuant to that certain *Standard Industrial/Commercial Single-Tenant Lease – Net* (the "Lease"). A copy of the Lease is attached to this Motion as Exhibit A.

By this Motion, the Trustee hereby moves the Court for an order authorizing the Trustee to assume the Lease and assign the Lease to the Successful Bidder, conditioned upon Court approval of the sale of the Property and the closing of the sale of the Property, and a waiver of the 14 day stay provided for in Rule 6004 of the Federal Rules of Bankruptcy Procedure.

Namco is not in default under the Lease.

PRINTED ON
RECYCLED PAPER    6964820v1

JMBM | Jeffer Mangels
Butler & Marmaro LLP

# III.

# STATEMENT OF FACTS

A.    General Case Background.

On December 22, 2008 (the "Petition Date"), involuntary chapter 11 petitions were filed against Namco and its sole shareholder Ezri Namvar ("Namvar"). On January 29, 2009, orders for relief were entered in both the Namco bankruptcy case and the Namvar bankruptcy case.

On March 11, 2009, the Court entered an order approving the appointment of R. Todd Neilson as the chapter 11 trustee in the Namvar bankruptcy case.

On May 8, 2009, the Court entered an order approving the appointment of Bradley D. Sharp as the chapter 11 trustee in the Namco bankruptcy case.

As of the Petition Date, Namco was a California corporation, and Namvar was the President, Chief Financial Officer, sole director and sole shareholder of Namco.

Prior to the Petition Date, Namco had been in business for approximately 20 years. Namco's business model was relatively simple and straightforward - Namco would borrow money from individuals ("Lender Funds"), most often members of the West Los Angeles Persian community (hereinafter referred to as a "Namco Lender"), agree to pay such Namco Lender a fixed rate of return, and Namco would then either lend those funds to third parties (hereinafter a "Borrower"), at interest rates typically six percent or more higher than the cost of capital payable to the Namco Lender, or invest such funds in various real estate projects. Most often, the funds provided by the Namco Lenders were not earmarked for a specific purpose; rather, such funds were pooled by Namco and lent to third parties as opportunities were presented. Typically, the transactions between Namco and a Namco Lender would be memorialized by way of an unsecured promissory note from Namco to the Namco Lender ("Note" or "Notes"), although in some cases Namco secured or attempted to secure the Notes in various ways, typically by assigning interests in third party deeds of trust owned by Namco or affiliates of Namco. Namvar purportedly personally guaranteed many of Namco's obligations to the Namco Lenders. So long as a Note was outstanding, Namco typically paid such Namco Lender interest on a monthly basis. The loans that Namco made to Borrowers were typically real estate loans secured by deeds of trust.

JMBM | Jeffer Mangels
Butler & Marmaro LLP

PRINTED ON
RECYCLED PAPER

6964820v1

1       B.    Trustee's Efforts to Sell the Property and the Proposed Sale.

2       Effective as of September 1, 2009, this Court authorized the Trustee to employ Lee &

3  Associates, Los Angeles West, Inc. ("Broker") as real estate brokers to market and sell the Property.

4  Broker began listing the Property on September 1, 2009.

5       Subject to overbid and the approval of this Court, Buyer has agreed to purchase the Property

6  from the Trustee, free and clear of all liens, claims, interests and encumbrances. The Purchase Price

7  for the Property is $3,000,000.00, pursuant to the terms and conditions of that certain *Standard*

8  *Offer, Agreement and Escrow Instructions for Purchase of Real Estate*, dated March 5, 2010 (the

9  "Sale Agreement"), a copy of which is appended to the attached Declaration of Bradley D. Sharp

10  ("Sharp Decl.") as Exhibit 1 to the 1929 Pico Sale Motion. The Trustee and Broker have evaluated

11  the offers received by the Trustee, and in the exercise of his reasonable business judgment, the

12  Trustee has decided to accept Buyer's offer, subject to Bankruptcy Court approval and overbid

13  pursuant to the procedures set forth below and as ordered by the Court (the "Sale Procedures"). A

14  complete copy of the Bid Procedures is attached as Exhibit A to the *Second Order Establishing*

15  *Bidding Procedures for the Sale of Estate Property [1929 Pico Boulevard]* (the "Sale Procedures

16  Order"), which order was entered on March 22, 2010 (Doc. No. 767). A true and correct copy of

17  the Sale Procedures Order is attached to the Sharp Decl. as Exhibit 2 to the 1929 Pico Sale Motion.

18       C.    The Lease.

19       The Property is leased by Namco to Loomis, Fargo & Co. ("Lessee") pursuant to that certain

20  *Standard Industrial/Commercial Single-Tenant Lease – Net* (the "Lease").

21       By this Motion, the Trustee hereby moves the Court for an order authorizing the Trustee to

22  assume the Lease and assign the Lease to the Successful Bidder, conditioned upon Court approval

23  of the sale of the Property and the closing of the sale of the Property.

24

25       Namco is not in default under the Lease.

26

27

28

# IV.

## ASSUMPTION AND ASSIGNMENT OF THE LEASE SHOULD BE APPROVED FREE

## AND CLEAR OF ALL

## LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES

A.    Assumption and Assignment of the Lease.

Assumption and assignment of the Lease to the Buyer/Successful Bidder is a material component of the Sale Agreement and is required to close the sale of the Property.

Section 365(a) of the Bankruptcy Code provides that "[e]xcept as provided in sections 765 and 766 in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

There are no defaults by Namco under the Lease.

Section 365(f) of the Bankruptcy Code authorizes the Trustee to assign the Lease, conditioned only upon assumption of the Lease and adequate assurance of future performance by the assignee of the Lease. The adequacy of the assurance is to be judged in commercial terms based upon a pragmatic analysis of the facts. *In re Sapolin,* 5 B.R. 412 (Bankr. E.D. N.Y. 1980); *In re Lafayette Radio Electronics Corp.,* 9 B.R. 993 (Bankr. E.D.N.Y. 1981). *Norton Bankruptcy Law and Practice, Third Edition* (Exec. Contracts & Unexpired Leases – Code § 365)(2008). As the Debtor is the lessor under the Lease and the Lease is not otherwise in default, the Trustee submits that there is adequate assurance of future performance.

Assumption and assignment of the Lease is in the best interests of the estate as it is necessary for the sale of the Property to close, which sale will generate gross sale proceeds of at least $3,000,000 for the estate. Application of a debtor in possession's or trustee's sound business judgment in the use, sale or lease of property of the estate is subject to great judicial deference. *Matter of WPRV-TV, Inc.,* 143 B.R. 315, 319 (D. P.R. 1991), aff'd in part, rev'd in part, 983 F.2d 336 (1st Cir. 1993); *In re Thrifty Liquors, Inc.,* 26 B.R. 26, 28 (Bankr. D. Mass. 1982). The application of the business judgment test affords a debtor in possession or trustee discretion in balancing the costs and benefits of administering or disposing of estate assets according to the needs of the estate. *See In re Canyon Partnership,* 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).

PRINTED ON
RECYCLED PAPER

6964820v1

1    Pursuant to § 363(b)(1), a debtor in possession or trustee must give notice of any sale of

2    property of the estate.  Most transactions not in the ordinary course of business are governed by

3    Federal Rule of Bankruptcy Procedure 6004.  Rule 6004(a) refers, in turn, to Rule 2002(a), which

4    requires a twenty-one (21) day notice period for any "proposed use, sale, or lease of property of the

5    estate other than in the ordinary course of business, unless the court for cause shown, shortens the

6    time . . . ." F.R.B.P. 2002(a).

7    The Trustee, pursuant to that *Order Establishing Notice Procedures and Permitting Service*

8    *on Insured Depository Institutions by First Class Mail* (the "Limited Notice Order"), entered on

9    February 9, 2009, has served the Notice of Motion and Motion on all parties entitled thereto as

10   established by the Limited Notice Order.    As such, the Trustee has satisfied the requirements for

11   accurate and reasonable notice.

12   B.    The Assignment of the Lease Should be Approved Free and Clear of all Liens,

13          Claims, Interests and Encumbrances.

14   Section 363(f) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee may

15   sell property . . . free and clear of any interest in such property of an entity other than the estate,

16   only if . . . (2) such entity consents; [or] (3) such interest is a lien and the price at which such

17   property is to be sold is greater than the aggregate value of all liens on such property; [or] (4) such

18   interest is in bona fide dispute  . . .."  11 U.S.C. § 363(f).  The language of § 363(f) is in the

19   disjunctive, that is, the sale free of the interest may occur if any one of the conditions of § 363(f)

20   has been met.  Here, each of the purported liens, claims, interests and encumbrances described in

21   the 1929 Pico Sale Motion is subject to a good faith dispute.

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER

JMBM    Jeffer Mangels
Butler & Marmaro LLP

6964820v1

## VII.

## CONCLUSION

Based on the foregoing the Trustee requests that this Court enter an order:

(1)    Authorizing the Trustee to assume the Lease and assign the Lease to the Successful Bidder, conditioned upon Court approval of the sale of the Property and the closing of the sale of the Property;

(2)    Waiving the 14 day stay provided for in Rule 6004 of the Federal Rules of Bankruptcy Procedure; and

(3)    Granting such other and further relief the Court deems just and proper.

Respectfully submitted,

Dated: April 21, 2010              JEFFER, MANGELS, BUTLER & MARMARO LLP


By: ____/s/ David M. Poitras_____
     DAVID M. POITRAS P.C.
     Counsel for Bradley D. Sharp,
     Chapter 11 Trustee for Namco Capital Group, Inc.

PRINTED ON
RECYCLED PAPER

6964820v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JMBM | Jeffer Mangels
Butler & Marmaro LLP

# DECLARATION OF BRADLEY D. SHARP

I, Bradley D. Sharp, declare as follows:

1.      I am the chapter 11 trustee for the bankruptcy estate of Namco Capital Group, Inc. Each of the facts contained in this declaration is based upon my personal knowledge and, if called as a witness to do so, I could competently testify thereto.

2.      The Court entered the order approving my appointment as chapter 11 trustee in this case on May 8, 2009.

3.      I make this declaration in support of the *Motion of Bradley D. Sharp (the "Trustee"), Chapter 11 Trustee for the Estate of Namco Capital Group, Inc. ("Debtor" or "Namco") for an Order Authorizing the Assumption and Assignment of a Lease of Real Property, Free and Clear of Liens, Claims, Interests and Encumbrances [1929 Pico Boulevard]* (the "1929 Pico Lease Motion" or "Motion").

4.      Subject to overbid and the approval of this Court, Rexford Industrial Realty and Management, Inc. (or its assignee)("Buyer") has agreed to purchase that certain real property and improvements thereon commonly known as 1929 Pico Boulevard, Los Angeles, California (the "Property"), free and clear of all liens, claims, interests and encumbrances (the "Sale").   The Purchase Price for the Property is $3,000,000.00, pursuant to the terms and conditions of that certain *Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate*, dated November March 5, 2010 (the "Sale Agreement"), a copy of which is attached to the 1929 Pico Sale Motion as Exhibit 1.

5.      I have evaluated the offers to purchase the Property I have received, and in the exercise of my reasonable business judgment, I have decided to accept Buyer's offer, subject to Bankruptcy Court approval and overbid pursuant to the procedures set forth herein and as ordered by the Court. A complete copy of the Bid Procedures is attached as Exhibit A to the *Second Order Establishing Bidding Procedures for the Sale of Estate Property [1929 Pico Boulevard]* (the "Sale Procedures Order") approved by the Court by order entered March 22, 2010 (Doc. No. 767). A true and correct copy of the Sale Procedures Order is attached to the 1929 Pico Sale Motion as Exhibit 2.

6964820v1

10

6.     The Property is leased by Namco to Loomis, Fargo & Co. ("Lessee") pursuant to that certain *Standard Industrial/Commercial Single-Tenant Lease – Net* (the "Lease"). A copy of the Lease is attached to this declaration as <u>Exhibit A</u>.

7.     Assumption and assignment of the Lease to the Buyer/Successful Bidder is a material component of the Sale Agreement and is required to close the sale of the Property. Assumption and assignment of the Lease is conditioned upon Bankruptcy Court approval of the sale of the Property and the closing of the sale of the Property.

8.     Namco is not in default under the Lease.

9.     Assumption and assignment of the Lease is in the best interests of the estate as it is necessary for the sale of the Property to close, which sale will generate gross sale proceeds of at least $3,000,000 for the estate.

     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed this 21st day of April, 2010 at Los Angeles, California.

_____
Bradley D. Sharp

PRINTED ON
RECYCLED PAPER

6964820v1

6.      The Property is leased by Namco to Loomis, Fargo & Co. ("Lessee") pursuant to that certain *Standard Industrial/Commercial Single-Tenant Lease – Net* (the "Lease").  A copy of the Lease is attached to this declaration as Exhibit A.

7.      Assumption and assignment of the Lease to the Buyer/Successful Bidder is a material component of the Sale Agreement and is required to close the sale of the Property. Assumption and assignment of the Lease is conditioned upon Bankruptcy Court approval of the sale of the Property and the closing of the sale of the Property.

8.      Namco is not in default under the Lease.

9.      Assumption and assignment of the Lease is in the best interests of the estate as it is necessary for the sale of the Property to close, which sale will generate gross sale proceeds of at least $3,000,000 for the estate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed this 21st day of April, 2010 at Los Angeles, California.

_____
Bradley D. Sharp

PRINTED ON
RECYCLED PAPER

6964820v1

11

# EXHIBIT A

06/14/2002 13:21 FAX          STAUBACH COMPANY                    ☒002

NAMCO          Fax:3102075596          Nov 19 '99  11:50    P. 02

AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION
STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE — NET
(DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

1.    Basic Provisions ("Basic Provisions").
      1.1    Parties: This Lease, dated for reference purposes only, January 14        1999 , is made
and between Namco Capital Group, Inc.

and Loomis, Fargo & Co., a Texas corporation

(collectively the "Parties," or individually a "Party").

      1.2    Premises: That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, and commonly
known as 1929 W. Pico Blvd.                    State of California
the County of Los Angeles

      1.3    Term: Fifteen (15) Years and 0      Months ("Original Term") commencing See Addendum

      1.4    Early Possession: N/A

      1.5    Base Rent: $15,500.00 per month ("Base Rent"), payable on the first

      1.6    Base Rent Paid Upon Execution: $0.00

      1.7    Security Deposit: N/A                    ("Security Deposit").

      1.8    Permitted Use: Office, warehouse and ancillary uses associated with armored transport
and security businesses

      1.9    Insuring Party: Lessor

      1.10   Real Estate Brokers:
             (a) Representation:

      ☐ N/A
      ☒ N/A
      ☐ N/A

             (b) Payment to Brokers:

      1.11   Guarantor:

      1.12   Addenda and Exhibits.

2.    Premises.
      2.1    Letting.

      2.2    Condition.

Page 1 of 11
REVISED

Initials

FORM STN

©1997 — American Industrial Real Estate Association

Exhibit A - 12

03/14/2002 13:25 FAX    STAUBACH COMPANY    @014
NFMCO    FAX:8102075596    NOV 19 '99  11:51    P. 03

2.4  Acknowledgements.

2.5  Lessee as Prior Owner/Occupant.

3.  Term.

3.1  Term.

3.2  Early Possession.

3.3  Delay In Possession.

3.4  Lessee Compliance.

4.  Rent.

4.1  Rent Defined.

4.2  Payment.

5.  Security Deposit.

6.  Use.

6.1  Use.

6.2  Hazardous Substances.

(a) Reportable Uses Require Consent.

©1997 - American Industrial Real Estate Association

Initials

Exhibit A - 13

08/14/2002 13:27 FAX                                  STAUBACH COMPANY                              @010
NBMCO                      Fax:3102075595                      Nov 19 '99  11:53    P. 05

respect to which any Applicable Requirements ... that a notice be given to persons entering on, occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, as long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground Lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance which came to, under or about the Premises, whether brought onto the Premises by or for Lessee, or any third party ... otherwise (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). ...

which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement or fraction, the numerator of which is one, and the denominator of which is the number of months of the useful life of such replacement as such useful life is specified pursuant to Federal income tax regulations or guidelines for depreciation thereof (including interest on the unamortized balance as is then commercially reasonable in the judgment of Lessor's accountants), will Lessee reserving the right to prepay its obligation at any time.

7.2    **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 1 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3    **Utility Installations; Trade Fixtures; Alterations.**

(a) **Definitions; Consent Required.** The term "Utility Installations" refers to all floor and window coverings, air lines, power panels, electric distribution, security and fire protection systems, communication systems, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" and/or "Utility Installations" are defined as Alterations and/or Utility Installations made to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, so long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, and the cumulative cost thereof during this Lease as extended does not exceed $50,000 in the aggregate or $10,000 in any one year.

(b) **Consent.** Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount equal to the greater of one month's Base Rent, or $10,000, Lessee may condition its consent upon Lessee providing a lien and completion bond in an amount equal to one and one-half times the estimated cost of such Alteration or Utility Installation.

(c) **Indemnification.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than ten (10) days' notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to one and one-half times the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4    **Ownership; Removal; Surrender; and Restoration.**

(a) **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time and at its option, elect in writing to Lessee to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per Paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than ninety (90) and not later than thirty (30) days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) **Surrender/Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broken clean and free of debris, in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee Owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee, and the removal, replacement, or remediation of any soil, material or groundwater contaminated by Lessee. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. The failure by Lessee to timely vacate the Premises pursuant to Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.    **Insurance; Indemnity.**

8.1    **Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee within ten (10) days following receipt of an invoice.

8.2    **Liability Insurance.**

(a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability Policy of Insurance protecting Lessee and Lessor against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $2,000,000 per occurrence with an "Additional Insured-Managers or Lessors of Premises Endorsement" and contain the "Amendment of the Pollution Exclusion Endorsement" for damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. All insurance carried by Lessee shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only, except to the extent of losses resulting from the acts of Lessor or its agents or employees at the Premises while performing the duties of Lessor under this Lease.

(b) **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3    **Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground lessor, and to any Lender(s) insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. If Lessor is the Insuring Party, however, Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4 rather than by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and Lender, insuring the loss of the full Rent for one (1) year. Said insurance shall provide that in the event the Lease is terminated by reason of an insured loss, period of indemnity for such coverage shall be extended beyond the date of the completion of repairs or replacement of the Premises, to provide for one full year loss of Rent from the date of any such loss. Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next twelve (12) month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's

08/14/2002 13:26 FAX                    STAUBACH COMPANY                    Nov 19 '99    11:52    P.04

NAMCO                    Fax:3102075596

petitions, use or occupancy of the Premises.

5.4    Lessee Property/Business Interruption Insurance.

(a) Property Damage.  Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.  Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence.  The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.  Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) Business Interruption.  Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) No Representation of Adequate Coverage.  Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

5.5    Insurance Policies.  Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least #x, V, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender.  Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance.  No such policy shall be cancelable or subject to modification except after thirty (30) days prior written notice to Lessor.  Lessee shall, at least thirty (30) days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand.  Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less.  If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

5.6    Waiver of Subrogation.  Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against hereunder, to the extent of insurance proceeds actually received by the acting party.  The effect of such releases and waivers is not limited to the amount of insurance carried or required, or by any deductibles applicable hereto.  The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

5.7    Indemnity.  Except for Lessor's or the agents' or contractors' gross negligence or willful misconduct, non-withstanding Section 5.6, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee, but to the extent insurance proceeds actually received by the waiving party.  If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense.  Lessor need not have first paid any such claim in order to be so defended or indemnified.

5.8    Exemption of Lessor from Liability.  Lessor shall not be liable for injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building of which the Premises are a part, or from other sources or places.  Lessor shall not be liable for any damages arising from any act or neglect of any other tenant of Lessor.  Notwithstanding Lessor's negligence or breach of this Lease, Lessor shall under no circumstances be liable for injury to Lessee's business or for any loss of income or profit therefrom.

6.    Damage or Destruction.

6.1    Definitions.

(a) "Premises Partial Damage" shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in six (6) months or less from the date of the damage or destruction.  Lessor shall notify Lessee in writing within thirty (30) days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b) "Premises Total Destruction" shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in six (6) months or less from the date of the damage or destruction.  Lessor shall notify Lessee in writing within thirty (30) days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) "Insured Loss" shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) "Replacement Cost" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) "Hazardous Substance Condition" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises.

6.2    Partial Damage - Insured Loss.  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessee's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessee's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose.  Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party's obligation to promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs.  In the event, however, such shortage was due to the fact that, by reason of the unique nature of the Improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within ten (10) days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said ten (10) day period, this party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect.  If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within ten (10) days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or have this Lease terminate thirty (30) days thereafter.  Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction.  Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 6.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

6.3    Partial Damage - Uninsured Loss.  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee accompanied by estimates of the cost to repair, if Lessor has procured same, to Lessee within thirty (30) days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective sixty (60) days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within ten (10) days thereafter to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within thirty (30) days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

6.4    Total Destruction.  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate sixty (60) days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

6.5    Damage Near End of Term.  If at any time during the last six (6) months of this Lease there is damage for which the cost to repair exceeds one (1) month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective sixty (60) days following the date of occurrence of such damage.

©1997 - American Industrial Real Estate Association

Initials _____

FORM STN-6-2

Exhibit A - 16

06/14/2002 13:20 FAX                STAUBACH COMPANY                    Ⓩ016
NAMCO                          Fax:3102075596        Nov 19 '99  11:25    P.07

by giving a written termination notice to Lessee within sixty (30) days after the date of occurrence of such ... Notwithstanding the foregoing, if Lessor at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is ten days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurances during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's obligation to pay shall be extinguished.

9.6   **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remediation.** If Lessor shall be obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within ninety (90) days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than sixty (60) days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within said thirty (30) days, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within said thirty (30) days, the beginning of the actual work on the Premises whichever first occurs. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7   **Termination - Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.8   **Waiver of Statutes.** Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.   **Real Property Taxes.**

10.1   **Definition of "Real Property Taxes."** As used herein, the term "Real Property Taxes" shall include any form of assessment, real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license or fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein, imposed by reason of events occurring during the term of this Lease including but not limited to, a change in the ownership of the Premises.

10.2

(a) **Payment of Taxes.** Lessee shall pay the Real Property Taxes applicable to the Premises during the term of this Lease. Subject to Paragraph 10.2(b), all such payments shall be made at least ten (10) days prior to any delinquency date. Lessee shall promptly furnish Lessor with satisfactory evidence that such taxes have been paid. If any such taxes shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such tax shall be prorated to cover only that portion of the tax bill applicable to the period that this Lease is in effect, and Lessor shall reimburse Lessee for any overpayment. If Lessee shall fail to pay any required Real Property Taxes, Lessor shall have the right to pay the same, and Lessee shall reimburse Lessor therefor upon demand.

(b) **Advance Payment.** In the event Lessee incurs a late charge on any Rent payment more than once in anytime (12) month period, Lessor at Lessor's option, estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee, either: (i) in a lump sum amount equal to the installment due, at least twenty (20) days prior to the applicable delinquency date, or (ii) monthly in advance with the payment of the Base Rent. If Lessee elects to require payment monthly in advance, the monthly payment shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessee is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sums as are necessary to pay such obligations. All monies paid to Lessor under this Paragraph may be intermingled with other monies of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any balance of funds paid to Lessor under the provisions of this Paragraph may, at the option of Lessor, be treated as an additional Security Deposit.

10.3   **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4   **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause such property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said personal property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within ten (10) days after receipt of a written statement.

11.   **Utilities.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises together with any taxes thereon. If any such services are not separately metered to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor of all charges jointly metered.

12.   **Assignment and Subletting.**

12.1   **Lessor's Consent Required.**

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent which consent shall not be unreasonably withheld.

(b) A change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of twenty-five percent (25%) or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than twenty-five percent (25%) of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transaction constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either (i) terminate this Lease, or (ii) upon thirty (30) days written notice, increase the monthly Base Rent to one hundred ten percent (110%) of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to one hundred ten percent (110%) of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to One Hundred Ten Percent (110%) of the scheduled adjusted rent.

(e) Lessee's remedy for any Breach of this Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

12.2   **Terms and Conditions Applicable to Assignment and Subletting.**

(a) Regardless of Lessor's consent, any assignment or subletting shall not: (i) be effective without the express written assumption by assignee or sublessee of the obligations of Lessor under this Lease; (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of ...

©1997 - American Industrial Real Estate Association

Page 6 of 11
REVISED

Initials _____

FORM STN-8-9/

NAMCO                    Fax:3102075596              Nov 19 '99  11:55    P. 08

assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessee's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefore to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $1,000 or ten percent (10%) of the current monthly Base Rent applicable to the portion of the Premises which is the subject of the proposed assignment or sublease, whichever is greater, as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested.

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment or entering into such sublease, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessee has specifically consented to in writing.

12.8   **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein.

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid Rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.   **Default; Breach; Remedies.**

13.1   **Default; Breach.** A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or rules under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of three (3) business days following written notice to Lessee.

(c) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) a Tenancy Statement, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42 (easements), or (viii) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of ten (10) days following written notice to Lessee.

(d) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b) or (c), above, where such Default continues for a period of thirty (30) days after written notice; provided, however, that if the nature of Lessee's Default is such that more than thirty (30) days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

(e) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within thirty (30) days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within thirty (30) days; provided, however, in the event that any provision of this subparagraph 13.1 is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(f) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(g) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within sixty (60) days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2   **Remedies.** If Lessee fails to perform any of its affirmative duties or obligations, within ten (10) days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. The costs and expenses of any such performance by Lessor shall be due and payable by Lessee upon receipt of invoice therefor. If any check given to Lessor by Lessee shall not be honored by the bank upon which it is drawn, Lessor, at its option, may require all future payments to be made by Lessee to be by cashier's check. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent (1%). Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a...

©1997 - American Industrial Real Estate Association

Page 7 of 11
REVISED

Initials _____

FORM STN-8-3

Exhibit A - 18

detainer upon a Breach of this Lease entitling Lessor to remedies provided for in this Lease and/or by said Laws.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    Inducement Recapture.    Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, and recoverable by Lessor, as additional rent due under this Lease, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of Rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    Late Charges.    Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessee by any Lender. Accordingly, if any Rent shall not be received by Lessor within five (5) days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a one-time late charge equal to ten percent (10%) of each such overdue amount. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    Interest.    Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within thirty (30) days following the date on which it was due for non-scheduled payments, shall bear interest from the date when due, as to scheduled payments, or the thirty-first (31st) day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be equal to the prime rate reported in the Wall Street Journal as published closest prior to the date when due plus four percent (4%), but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charges provided for in Paragraph 13.4.

13.6    Breach by Lessor.

(a) Notice of Breach.    Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than thirty (30) days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessor in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than thirty (30) days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such thirty (30) day period and thereafter diligently pursued to completion.

(b) Performance by Lessee on Behalf of Lessor.    In the event that neither Lessor nor Lender cures said breach within thirty (30) days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent an amount equal to the greater of one months Base Rent or the Security Deposit, and to pay an excess of such expense under protest to Lessor, reserving Lessee's right to reimbursement from Lessor. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    Condemnation.    If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than ten percent (10%) of any building portion of the Premises, or more than twenty-five percent (25%) of the land area portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within ten (10) days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within ten (10) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.    Brokers' Fees.

15.1    Additional Commission.    In addition to the payments owed pursuant to Paragraph 1.10 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee acquires any rights to the Premises or other premises owned by Lessor located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of the Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a commission in accordance with the schedule of said Brokers in effect at the time of the execution of this Lease.

15.2    Assumption of Obligations.    Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Each Broker shall be a third party beneficiary of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to a Broker any amounts due and for commissions pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within ten (10) days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessee's Broker.

15.3    Representations and Indemnities of Broker Relationships.    Lessee and Lessor each represent and warrant to the other that it has no obligation or dealings with any person, firm, broker or finder other than the Brokers, if any, in connection with this Lease, and that no one other than said named Brokers is entitled to any compensation or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, and/or attorneys' fees reasonably incurred with respect thereto.

16.    Estoppel Certificates.

(a) Each Party (as "Responding Party") shall within ten (10) days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the American Industrial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such ten day period, the Requesting Party may execute an Estoppel Certificate stating that (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's Rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including, but not limited to, Lessee's financial statements for the past three (3) years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    Definition of Lessor.    The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall

08/14/2002 13:32 FAX                    STAUBACH COMPANY                    ☑021

NAMCO                          Fax:3102075596          Nov 19 '99  11:58   P. 10

the transferee or assignee (in cash or by credit) any ... cash Security Deposit held by Lessor. Except as provi ... in Paragraph 15, upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined. Notwithstanding the above, and subject to the provisions of Paragraph 20 below, the original Lessor under this Lease, and all subsequent holders of the Lessor's interest in this Lease shall remain liable and responsible with regard to the potential duties and liabilities of Lessor pertaining to Hazardous Substances as outlined in Paragraph 6 above.

18.    **Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.    **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.    **Limitation on Liability.** Subject to the provisions of Paragraph 17 above, the obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, the individual partners of Lessor or its or their individual partners, directors, officers or shareholders, and Lessee shall look to the Premises and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against the individual partners of Lessor, or its or their individual partners, directors, officers or shareholders, or any of their personal assets for the ... performance or covenant to be performed or observed by the Parties under this Lease.

21.    **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.    **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the nature, quality and character of the Premises. Brokers have no responsibility with respect thereto and shall not be responsible for any default or breach hereof by either Party. The liability (including court costs and Attorneys' fees) of any Broker with respect to negotiation, execution, delivery or performance by either Lessor or Lessee under this Lease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

23.    **Notices.**

       23.1 **Notice Requirements.** All notices required or permitted by this Lease shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, (followed by overnight registered mail delivery) and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted subject to a Party ... signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address or ... notice ... except that upon Lessee's taking possession of the Premises ... shall constitute Lessee's address for notice. A copy of all notices to Lessee shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

       23.2 **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given forty-eight (48) hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given twenty-four (24) hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt, provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.    **Waivers.** No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or constitute the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

25.    **Recording.** Either Lessor or Lessee shall, upon request of the other, execute, acknowledge and deliver to the other a short form memorandum of this Lease for recording purposes. The Party requesting recordation shall be responsible for payment of any fees applicable thereto.

26.    **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to one hundred fifty percent (150%) of the Base Rent applicable during the immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.    **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.    **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.    **Binding Effect; Choice of Law.** This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.    **Subordination; Attornment; Non-Disturbance.**

       30.1 **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lessor's Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

       30.2 **Attornment.** Subject to the non-disturbance provisions of Paragraph 30.3, Lessee agrees to attorn to a Lender or any other party who acquires ownership of the Premises by reason of a foreclosure of a Security Device, and that in the event of such foreclosure, such new owner shall not: (i) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (ii) be subject to any offsets or defenses which Lessee might have against any prior lessor; or (iii) be bound by prepayment of more than one (1) month's rent.

       30.3 **Non-Disturbance.** With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within sixty (60) days after the execution of this Lease, Lessor shall use commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said sixty (60) days, then Lessee may, at Lessee's option, directly contact Lessor's lender and attempt to negotiate the execution and delivery of a Non-Disturbance Agreement.

       30.4 **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises to enforce the terms hereof or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all reasonable attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach.

32.    **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of ...

©1997 — American Industrial Real Estate Association

Page 9 of 11
REVISED

Initials _____

FORM STN-8-3

Exhibit A - 20

NAMCO                    Fax:3102075596          Nov 19 '99  11:59    P.11

emergency, and otherwise at reasonable times, in ... to Lessee permitted that Lessee's representative ... at all times have the right to accompany Lessee's representatives, for the purpose of showing the same to prospective purchasers, lenders, or lessees, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary. All such activities shall be without abatement of rent or liability to Lessee. Lessor may at any time place on the Premises any ordinary "For Sale" signs and Lessor may during the last six (6) months of the term hereof place on the Premises any ordinary "For Sale" signs. Lessee may at any time place on the Premises any ordinary "For Sublease" sign.

33.   **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.   **Signs.** Except for ordinary "For Sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.   **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within ten (10) days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.   **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including, but not limited to, architects', attorneys', engineers' or other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including, but not limited to, consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgement that no Default or Breach exists or of any Breach of this Lease exists, as consequence of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within ten (10) business days following such request.

37.   **Guarantor.**
      37.1  **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the American Industrial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under the Lease.
      37.2  **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) a Tenancy Statement, or (d) written confirmation that the guaranty is still in effect.

38.   **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.   **Options.**
      39.1  **Definition.** "Option" shall mean: (a) the right to extend the term of or renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase or the right of first refusal to purchase the Premises or other property of Lessor.
      39.2  **Options Personal To Original Lessee.** Each Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.
      39.3  **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless prior Options have been validly exercised.
      39.4  **Effect of Default on Options.**
            (a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given three (3) or more notices of separate Default, whether or not the Defaults are cured, during the twelve (12) month period immediately preceding the exercise of the Option.
            (b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).
            (c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term, (i) Lessee fails to pay Rent for a period of thirty (30) days after such Rent becomes due (without any necessity of Lessor to give notice thereof), (ii) Lessor gives to Lessee three (3) or more notices of separate Default during any twelve (12) month period, whether or not the Defaults are cured, or (iii) if Lessee commits a Breach of this Lease.

40.   **Multiple Buildings.** If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will observe all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and that Lessee will pay its fair share of common expenses incurred in connection therewith.

41.   **Security Measures.** Lessee hereby acknowledges that the rental payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.   **Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights, and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.   **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other Under provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.

44.   **Authority.** If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of said entity. Each Party shall, within thirty (30) days after request, deliver to the other Party satisfactory evidence of such authority.

45.   **Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.   **Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.   **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.   **Multiple Parties.** If more than one person or entity is named herein as either Lessor or Lessee, such multiple Parties shall have joint and several responsibility to comply with the terms of this Lease.

49.   **Mediation and Arbitration of Disputes.** An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☒ is not attached to this Lease.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE

Page 10 of 11
REVISED

Initials ___

FORM GTN-6

©1997 - American Industrial Real Estate Association

Exhibit A - 21

06/14/2002 13:24 FAX                          STAUBACH COMPANY                                     ☑011

NAMCO                    Fax:5102075596              Nov 19 '99   12:05      P.09

THIS LEASE IS EXECUTED. THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND ESTUATE THE INTENT AND PURPOSE OF
LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION OR BY AN
BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH I
RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL, AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOUL
INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, TH
STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE
INTENDED USE.

WARNING: IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO B
REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: Los Angeles, CA                        Executed at: Houston, Texas
on:                                                 on: January 28, 1999
by LESSOR:                                           by LESSEE:
Namco Capital Group, Inc.                           Loomis, Fargo & Co., a Texas corporation

By: _____                             By: _____

Name Printed: Ezri Namvor                           Name Printed: James H. Cummings, Jr.
Title: President                                    Title: Executive Vice President & CFO

By: _____                             By: _____
Name Printed:                                       Name Printed:
Title:                                              Title:
Address: 11849 Montana Ave., Suite 100,             Address: Staubach Portfolio Services Agent
Los Angeles, CA 90049                               Loomis, Fargo & Co. Lease Admin.
                                                    6330 LBJ Freeway, Suite 1100
                                                    Dallas, TX 75240
                                                    w/copy to: Chief Financial Officer
                                                    Loomis, Fargo & Co.
                                                    2500 City West Blvd., Suite 800
                                                    Houston, TX 77042

Telephone (310) 207-1000                            Telephone (713)   435-6756
Facsimile (310) 207-8808                            Facsimile (713)   435-5928
Federal ID No.                                      Federal ID No.    75-0017290

NOTE: These forms are often modified to meet the changing requirements of law and industry needs. Always write or call to make su
you are utilizing the most current form! AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION, 700 So. Flower Street, Suite
Los Angeles, California 90017, (213) 687-8777, Fax No. (213) 687-8616

Page 44 of 44
REVISED

FORM STN

©1997 - American Industrial Real Estate Association

08/14/2002 13:25 FAX          STAUBACH COMPANY                              ☒012
NAMCO                    Fax:31320755306          Nov 19 '99  12:05    P.10

# RENT ADJUSTMENT(S)
## STANDARD LEASE ADDENDUM

Dated January 14 , 1999

By and Between (Lessor) Namco Capital Group, Inc.

(Lessee) Loomis, Fargo & Co.

Address of Premises: 1933 W. Pico Blvd.
Los Angeles, CA

Paragraph _____

A.   RENT ADJUSTMENT(S):
     The monthly rent for each month of the adjustment period(s) specified below shall be increased using the method(s) indicated below:
(Check Method(s) to be Used and Fill in Appropriately)

☒  1.  Cost of Living Adjustment(s) (COLA)
        a.  On (Fill in COLA Dates): 24 gdt day of each calendar year

The Base Rent shall be adjusted by this change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of
U.S. Department of Labor for (select one)☐ CPI W (Urban Wage Earners and Clerical Workers) or ☒ CPI U (All Urban Consumers), for (Fill in Urban Area):
_____ All Items
(1982-1984 = 100), herein referred to as the "Index".

        b.  The monthly rent payable in accordance with paragraph A.1a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph
1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month two months prior to the month(s) spec
In paragraph A.1a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is two mon
prior to (select one): ☒ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill In Other "Base Month):
_____  The sum so calculated shall constitute the new monthly rent hereunder, but in no event, shall any such new monthly ren
less than the rent payable for the month immediately preceding the rent adjustment.

        c.  In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shal
discontinued, then the Index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such altern
Index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the dec
of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☒  2.  Market Rental Value Adjustment(s) (MRV)
        a.  On (Fill in MRV Adjustment Date(s): _____

The Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:
        1)  Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV
be on the adjustment date. If agreement cannot be reached within thirty days, then:
            (a) Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next thirty
Any associated costs will be split equally between the Parties, or
            (b) Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writ
arbitration in accordance with the following provisions:
                (i) Within fifteen days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant" - check one) of
choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.
                (ii) The Three arbitrators shall within thirty days of the appointment of the third arbitrator reach a decision as to what the actual MRV f
Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Partie
submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.
                (iii) If either of the Parties fails to appoint an arbitrator within the specified fifteen days, the arbitrator timely appointed by one of ther
reach a decision on his or her own, and said decision shall be binding on the Parties.
                (iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, in the one that is NOT the c
to the actual MRV.
        2)  Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustmen
        b.  Upon the establishment of each New Market Rental Value:

Initials: ___                                                                                                    Initials: ___

                                        RENT ADJUSTMENTS
                                         Page 1 of 2

For this form, write American Industrial Real Estate Association, 700 S. Flower Street, Suite 600, Los Angeles, Calif. 90017
                                          REVISED .                                       FORM RA-1
4/1997 © American Industrial Real Estate Association

1) the new MRV will become the new Base Rent for the purpose of calculating any further Adjustments, and
2) the first month of each Market Rental Value term shall become the new Base Month for the purpose of calculating any further Adjustments.

☐ III.  Fixed Rental Adjustment(s) (FRA)
The Base Rent shall be increased to the following amounts on the dates set forth below:

On (Fill in FRA Adjustment Date(s)):          The New Base Rent shall be:

_____          $ _____
_____          $ _____
_____          $ _____
_____          $ _____

B.  NOTICE:
    Unless specified otherwise herein, notice of any such adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C.  BROKER'S FEE:
    The Brokers specified in paragraph 1.10 shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

Initials: _____                                                    Initials: _____

RENT ADJUSTMENTS
Page 2 of 2

For this form, write American Industrial Real Estate Association, 700 S. Flower Street, Suite 600, Los Angeles, Calif. 90077
©1997 - American Industrial Real Estate Association                    REVISED                        FORM RA-2-7/97

Exhibit A - 24

06/14/2002 13:21 FAX                    STAUBACH COMPANY                    ☒003
        NAMCO              Fax:3102075596        Nov 19 '99  12:02    P.01

## ADDENDUM TO LEASE

THIS ADDENDUM TO LEASE (this "Addendum") is attached to and incorporated in that certain Standard Industrial/Commercial Single Tenant Lease-Net dated as of January 14, 1999 (the "Lease") between Namco Capital Group, Inc. ("Lessor") and Loomis, Fargo & Co. ("Lessee"). The provisions of this Addendum shall control over the provisions of the form Lease in the event of any conflict. All references in this Addendum to the "Lease" shall be deemed to include this Addendum unless the context requires otherwise. The following provisions are incorporated in the Lease:

1.      SUBJECT TO COMPLETION OF THE LESSOR'S WORK (AS DEFINED BELOW), LESSEE HEREBY ACKNOWLEDGES AND AGREES THAT THE LEASE OF THE PREMISES HEREUNDER IS AND WILL BE MADE ON AN "AS IS, WHERE IS" BASIS AND THAT NEITHER LESSOR, NOR ANY ATTORNEY, REPRESENTATIVE, AGENT OR EMPLOYEE OF LESSOR HAS MADE, OR WILL MAKE, AND, EXCEPT AS EXPRESSLY SET FORTH IN THIS LEASE, LESSOR SPECIFICALLY NEGATES AND DISCLAIMS, ANY REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, FUTURE OR OTHERWISE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PREMISES, INCLUDING, WITHOUT LIMITATION, (1) ENVIRONMENTAL MATTERS RELATING TO THE PREMISES OR ANY PORTION THEREOF, (2) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND FAULTING, (3) WHETHER OR NOT AND TO THE EXTENT TO WHICH THE PREMISES OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD, (4) DRAINAGE, (5) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDE, OR THE SUFFICIENCY OF ANY UNDERSHORING, (6) ZONING, AND OTHER RESTRICTIONS IMPOSED BY ANY GOVERNMENTAL AGENCY OR AUTHORITY, OF ANY KIND WHATSOEVER, TO WHICH THE PREMISES OR ANY PORTION THEREOF MAY BE SUBJECT, (7) THE AVAILABILITY OF ANY UTILITIES TO THE PREMISES OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, WATER, SEWAGE, GAS AND ELECTRIC, (8) USAGES OF ADJOINING PREMISES, (9) ACCESS TO THE PREMISES OR ANY PORTION THEREOF, (10) THE VALUE, SIZE, LOCATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE PREMISES, ANY IMPROVEMENTS ON THE PREMISES, OR ANY PORTION THEREOF, OR ANY LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE PREMISES OR ANY PART THEREOF, (11) THE PRESENCE OF HAZARDOUS MATERIALS IN OR ON, UNDER OR IN THE VICINITY OF THE PREMISES, (12) THE

06/14/2002 13:22 FAX                    STAUBACH COMPANY                              004
NRMCO                      Fax:13102075596              Nov 19 '99   12:03   P.02

CONDITION OR USE OF THE PREMISES OR COMPLIANCE OF THE PREMISES WITH ANY OR ALL PAST, PRESENT OR FUTURE FEDERAL, STATE OR LOCAL ORDINANCE, RULES, REGULATIONS OR LAWS, BUILDING, FIRE OR ZONING ORDINANCES, CODES OR OTHER SIMILAR LAWS, (13) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS, (14) ANY MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE LAND OR IMPROVEMENTS, (15) THE POTENTIAL FOR DEVELOPMENT OF THE PREMISES, (16) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE PREMISES, (17) THE MERCHANTABILITY OF THE PREMISES OR FITNESS OF THE PREMISES FOR ANY PARTICULAR PURPOSE (LESSEE AFFIRMING THAT LESSEE HAS NOT RELIED ON LESSOR'S SKILL OR JUDGMENT TO SELECT OR FURNISH THE PREMISES FOR ANY PARTICULAR PURPOSE, AND THAT LESSOR MAKES NO WARRANTY THAT THE PREMISES IS FIT FOR ANY PARTICULAR PURPOSE), OR (18) WHETHER THE PREMISES ARE IN COMPLIANCE WITH APPLICABLE LAWS, REGULATIONS, ORDINANCES AND CODES. LESSEE ACKNOWLEDGES THAT IT HAS BEEN IN POSSESSION AND OCCUPANCY OF THE PREMISES FOR SEVERAL YEARS AND THAT IT HAS COMPLETED ALL PHYSICAL, FINANCIAL REGULATORY AND OTHER STUDIES, ANALYSES AND EXAMINATIONS RELATING TO THE LEASE OF THE PREMISES HEREUNDER AND WILL LEASE THE SAME SOLELY ON THE BASIS OF SUCH STUDIES, ANALYSES AND EXAMINATIONS AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY LESSOR. LESSOR SHALL NOT BE LIABLE FOR ANY NEGLIGENT MISREPRESENTATION OR ANY FAILURE BY LESSEE TO INVESTIGATE THE PREMISES AND ALL MATTERS RELATED THERETO, NOR SHALL LESSOR BE BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS, APPRAISALS, ENVIRONMENTAL ASSESSMENT REPORTS, OR OTHER INFORMATION PERTAINING TO THE PREMISES OR THE OPERATION THEREOF, FURNISHED BY LESSOR OR BY ANY REAL ESTATE BROKER, AGENT, REPRESENTATIVE, EMPLOYEE, OR OTHER PERSON ACTING ON LESSOR'S BEHALF, EXCEPT FOR EXPRESS WRITTEN REPRESENTATIONS SIGNED BY LESSOR WHICH ARE EXPLICITLY ADDRESSED TO LESSEE. IT IS UNDERSTOOD AND AGREED THAT THE PREMISES IS LEASED BY LESSOR TO LESSEE SUBJECT TO THE FOREGOING.

2.     For purposes of this Lease, the term "Commencement Date" shall mean the date which is thirty (30) days after completion of the Lessor's Work, and the term "Expiration Date" shall mean the date which is fifteen (15) years after the Commencement Date. If requested by Lessor, after completion of the Lessor's Work, Lessee shall promptly execute and deliver a memorandum setting forth with specificity the Commencement Date and the Expiration Date.

3.     Notwithstanding Paragraph 2.3 of the Lease, in the event that Capital Expenditures are necessitated by or required in connection with an event of damage or

Exhibit A - 26

08/14/2002 13:22 FAX          STAUBACH COMPANY                          Ø005
NAMCO              - Fax:3102075596         Nov 19 '99   12:03   P. 03

destruction which (a) is not an insured Loss, or (b) which Lessee is not required to insure under the Lease, or (c) results from the negligence or willful act of Lessee or its invitees (in which event Lessee shall be responsible for paying for such Capital Expenditures), Lessor may either (X) proceed with the Capital Expenditures as soon as reasonably possible at its own expense, in which event this Lease will remain in full force and effect, or (y) notify Lessee of Lessor's intent to terminate the Lease in accordance with Paragraph 9.3.

4.     In connection with the execution of this Lease, Lessor shall, at Lessor's sole cost and expense, promptly after execution of this Lease, retain qualified licensed contractors, architects and/or engineers, procure the necessary permits and complete the following (collectively the "Lessor's Work") at the Premises:

1. Structural alterations necessary to bring the Premises into compliance with Los Angeles Municipal Codes including, but not limited to ordinance numbers 169341 and 170605, relating to the seismic strengthening of tilt-up concrete wall buildings.

2. Removal and disposal of existing roof. Replace all flashing and install a built-up roof system that has a minimum five-year warranty on labor and fifteen (15) year warranty on materials.

3. Remove all existing air conditioning equipment and install all platforms, electrical, plumbing and gas connections, thermostats, and smoke detectors necessary to tie-in 9 new units to existing supply and return ducts. Units will be of sufficient capacity to comfortably heat and cool the Premises. All units will have a minimum 1-year warranty on parts and labor with five (5) years on the compressor.

4. Replace fresh air exhaust system in the garage area of the Premises. System will be of sufficient cubic feet per minute to adequately ventilate truck exhaust fumes from Lessee's operations.

5. Install one or more swamp coolers or other comparable evaporative type coolers to adequately cool the garage area of the Premises.

6. Repair potholes and deficient parking lot conditions. Prepare surface and apply 1.5" asphalt surface coat.

7. Install automatic gate opener hardwired to the control room of the Premises.

8. Conduct electrical repairs, replace bulbs and ballasts necessary to bring all interior fluorescent light fixtures into proper working order. Replace all damaged interior fixtures. Install new high-pressure sodium fixtures to illuminate West and North perimeter areas of the Premises. Replace exterior fixtures on south end and east sides of building with high-pressure sodium fixtures that properly illuminate parking and perimeter areas of the Premises.

9. Install 40-ounce commercial grade carpet in downstairs area of the building. Paint entire area.

10. Upstairs office area - Replace drop-in ceiling tiles and repair or replace damaged grid. Remove existing floor tile in hallway and replace with

appropriate commercial-grade vinyl floor tile. Install new 40 ounce commercial grade carpet in all areas, paint offices and hallways.

All of the Lessor's Work shall be performed in a workmanlike fashion using standard industrial materials, and shall be completed in a manner which is in compliance with applicable laws. Lessee shall have the right to appoint a representative to meet with Lessor and its contractor during the performance of the Lessor's Work to keep abreast of the progress thereof, and to make suggestions as to any details which will materially impact Lessee's use of the Premises and its obligations under the Lease. Lessor shall use good faith efforts to integrate any such suggestions, provided that Lessor will not incur material additional cost, expense or delay in connection therewith. After completion of the Lessor's Work, Lessee shall be responsible for the repair and maintenance of all elements of the Premises, as set forth in the Lease, provided that Lessor shall assign to Lessee, to the extent required by Lessee for the assertion of the benefits thereof in connection with a matter for which Lessee would be responsible under this Lease, any construction warranties and/or guaranties provided by Lessor's contractor(s) with respect to the Lessor's Work.

IN WITNESS WHEREOF, this Addendum has been executed concurrent with the Lease.

NAMCO CAPITAL GROUP, INC.

By: _____
    Ezri Namvar

LOOMIS, FARGO & CO.

By: _____
Name: _____

06/14/2002 13:23 FAX                    STAUBACH COMPANY                            @007
NAMCO                    Fax:3102075596              Nov 19 '99    12:04    P.05

### EXHIBIT "A"
### LEGAL DESCRIPTION

Lots 19, 20, 21 and 22 and the southwesterly 40 feet of Lot 23 of Victoria Tract as per map recorded in Book 34, Page 7 of miscellaneous records in the office of the County Recorder of Los Angeles County, California.





# AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION

## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET

### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

1.  **Basic Provisions ("Basic Provisions").**
    1.1    **Parties:** This Lease ("Lease"), dated for reference purposes only, January 14            1999      , is made by
and between Namco Capital Group, Inc.

---

## Commencement Date Memorandum

Namco Capital Group, Inc.
11940 San Vicente Blvd.
Los Angeles, CA 90049
Attn.: Ezri Namvar

Dear Mr. Namvar:

With respect to the lease dated January 14, 1999 (the "Lease") between Namco Capital
Group, Inc. ("Lessor") and Loomis, Fargo & Co. ("Lessee"), by which Lessor leased to
Lessee and Lessee leased from Lessor that certain building located at 1925 West Pico
Blvd., Los Angeles, California ("Premises"), Lessee confirms, acknowledges and
certifies to Lessor that Lessee has accepted and is in possession of the Premises, and that
all of the work to have been performed by Lessor under the Lease, as specified in the
Addendum thereto, has been substantially completed. Accordingly, the parties hereby
confirm, agree and acknowledge that the "Commencement Date" under the Lease shall
be October 1, 1999, and the "Expiration Date" shall be September 30, 2014.

In witness whereof, this Commencement Date Memorandum is executed on January 26,
2000.

Loomis, Fargo & Co.

By:
Its:       Executive Vice President
           & Chief Financial Officer

Namco Capital Group, Inc.

By:
Its:       President

Initials

FORM STN-S-2/87E

1997 - American Industrial Real Estate Association

Exhibit A - 30.

In no event be earlier than the last day of the Lease. If Lessee utilizes the Premises without commencing ... shall Expenditure.

Upon written notice to Lessee and payment of all Base Rent and other amounts which Lessee would have been obligated to pay through the expiration Date.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor and Lessee shall allocate the obligation to pay for such costs pursuant to the provisions of Paragraph 7.1(c); provided, however, that if such Capital Expenditure is required during the last two years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay the share thereof, Lessor shall have the right to terminate this Lease upon ninety (90) days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within ten (10) days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon thirty (30) days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditure are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall be fully responsible for the cost thereof, and Lessee shall not have any right to terminate this Lease.

2.4   Acknowledgements. Lessee acknowledges that: (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements), and their suitability for Lessee's intended use, (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises; and (c) neither Lessor, Lessor's agents, nor any Broker has made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (a) Broker has made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises; and (b) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants. SEE ADDENDUM

2.5   Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessor shall be responsible for any necessary corrective work.

3.   Term.

3.1   Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2   Early Possession. If Lessee presently totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such early possession. All other terms of this Lease (including, but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall, however, be in effect during such period. Any such early possession shall not affect the commencement date or the Expiration Date.

3.3   Delay in Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession as agreed, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease, nor shall Lessor be obligated to pay Rent or perform its other obligations until it receives possession of the Premises. If possession is not delivered within sixty (60) days after the Commencement Date, Lessee may, at its option, by notice in writing within ten (10) days after the end of such sixty (60) day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such notice is not received by Lessor within said ten (10) day period, Lessee's right to cancel shall terminate. Except as otherwise provided, if possession is not tendered to Lessee by the Start Date and Lessee does not terminate this Lease, as aforesaid, any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession of the Premises is not delivered within four (4) months after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4   Lessee Compliance. Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.   Rent.

4.1   Rent Defined. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2   Payment. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. Rent for any period during the term hereof which is for less than one (1) full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.

5.   Security Deposit. Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due Lessor or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of said Security Deposit, Lessee shall within ten (10) days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on said change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within fourteen (14) days after the expiration or termination of this Lease, if Lessor elects to apply the Security Deposit only to unpaid Rent, and otherwise within thirty (30) days after the Premises have been vacated pursuant to Paragraph 7.4(c) below, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease. Lessor has not received from, and is not holding, any security or other deposit from the account or benefit of Lessee.

6.   Use.

6.1   Use. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs other owners and/or occupants of, or causes damage to neighboring properties. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the Improvements on the Premises or the mechanical or electrical systems therein, is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within five (5) business days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in use.

6.2   Hazardous Substances.

(a) Reportable Uses Require Consent. The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with

©1997 - American Industrial Real Estate Association

Initials _____

FORM STN-4-2/97E

Exhibit A - 31

respect to which any Applicable Requirement ... res that a notice be given to persons entering ... upying the Premises or neighbouring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or impose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(c) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(d) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance which arose on, under in or about the Premises, whether brought onto the Premises by or for Lessee, or any third party, or otherwise (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties or with regard to any Hazardous Substances which existed on the Premises prior to the occupancy of all or part of the Premises by Lessee or its predecessor in interest, pursuant to the Industrial Lease dated December 10, 1974 with respect to the Premises, or any earlier lease or occupancy agreement). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property (the "Prior Lease") or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e) **Lessor Indemnification.** Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which existed as a result of Hazardous Substances on the Premises prior to the commencement of the Prior Lease, Start Date or which came from off-site sources other than due to an act or omission of Lessee, or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) Investigations and Remediations. Lessor shall retain the responsibility and pay for any investigations or remediation measure required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Start Date, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in Paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) **Lessor Termination Option.** If a Hazardous Substance Condition occurs during the term of this Lease, unless Lessee is legally responsible therefor under this Lease, otherwise legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(c) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds twelve (12) times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within thirty (30) days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date sixty (60) days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within ten (10) days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to twelve (12) times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within thirty (30) days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, the Lease shall terminate as of the date specified in Lessor's notice of termination.

**6.3   Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said requirements are now in effect or become effective after the Start Date. Lessee shall, within ten (10) days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.

**6.4   Inspection; Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30 below) and consultants shall have the right to enter into the Premises at any time, in the case of an emergency, and otherwise at reasonable times, upon prior notice, provided that a representative of Lessee shall have the right to accompany Lessor's representative at all times, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a contamination is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspections, so long as such inspection is reasonably related to the violation or contamination that Lessee is responsible for under the Lease.

**7.     Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

**7.1     Lessee's Obligations.**

(a) **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations, and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, heating, ventilating, air-conditioning, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

(b) **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance and typically maintained for properties similar to the Premises for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, (vi) driveways and parking lots, (vii) clarifiers (viii) basic utility feed to the perimeter of the Building, and (ix) any other equipment, if reasonably required by Lessor.

(c) **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if the Basic Elements described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such Basic Elements, then such Basic Elements shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of the Lease, on the date on

Page 3 of 11
REVISED

©1997 - American Industrial Real Estate Association

Initials _____

FORM STN-8-2/97E

Exhibit A - 32

which Base Rent is due, an amount equal [...] uduct of multiplying the cost of such replacems [...] fraction, the numerator of which is one, and the denominator of which is the number of months of the useful life of such replacement as such useful life is specified pursuant to Federal Income tax regulations or guidelines for depreciation thereof (including interest on the unamortized balance as is than commercially reasonable in the judgment of Lessor's accountants), with Lessee reserving the right to prepay its obligation at any time.

7.2    Lessor's Obligations.  Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance),  9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3    Utility Installations; Trade Fixtures; Alterations.

(a) Definitions; Consent Required.  The term "Utility Installations" refers to all floor and window coverings, air lines, power panels, electrical distribution, security and fire protection systems, communication systems, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a). Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent.  Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, and the cumulative cost thereof during this Lease as extended does not exceed $50,000 in the aggregate or $10,000 in any one year.

(b) Consent.  Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount equal to the greater of one month's Base Rent, or $10,000, Lessor may condition its consent upon Lessee providing an additional Security Deposit with Lessor.

(c) Indemnification.  Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than ten (10) days' notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to one and one-half times the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4    Ownership; Removal; Surrender; and Restoration.

(a) Ownership.  Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations or Utility Installations. Unless otherwise instructed per Paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) Removal.  By delivery to Lessee of written notice from Lessor not earlier than ninety (90) and not later than thirty (30) days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) Surrender/Restoration.  Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee Owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee, and the removal, replacement, or remediation of any soil, material or groundwater contaminated by Lessee. Trade Fixtures shall remain the property of Lessee and be removed by Lessee. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.    Insurance; Indemnity.

8.1    Payment For Insurance.  Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within ten (10) days following receipt of an invoice.

8.2    Liability Insurance.

(a) Carried by Lessee.  Lessee shall obtain and keep in force a Commercial General Liability Policy of Insurance protecting Lessee and Lessor against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto.  Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $2,000,000 per occurrence with an "Additional Insured-Managers or Lessors of Premises Endorsement" and contain the "Amendment of the Pollution Exclusion Endorsement" for damage caused by heat, smoke or fumes from a hostile fire. The Policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. All insurance carried by Lessee shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only except to the extent of losses resulting from the acts or negligence of the agents or employees of the Premises while performing the duties of Lessor under this Lease.

(b) Carried by Lessor.  Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3    Property Insurance - Building, Improvements and Rental Value.

(a) Building and Improvements.  The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any groundlessor, and to any Lender(s) insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lenders, but in no event more than the commercially reasonable and available insurable value thereof. If Lessor is the Insuring Party, however, Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4 rather than by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for any additional costs resulting from debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an insured loss.

(b) Rental Value.  The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one (1) year. Said insurance shall provide that in the event the Lease is terminated by reason of an insured loss, the period of indemnity for such coverage shall be extended beyond the date of the completion of repairs or replacement of the Premises, to provide for one full year's loss of Rent from the date of any such loss. Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next twelve (12) month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) Adjacent Premises.  If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts,

Initials [signatures]

FORM STN-8-8/97E

©1997 - American Industrial Real Estate Association

Exhibit A - 33

privations, use or occupancy of the Premises.

9.4    Lessee's Property/Business Interruption Insurance.

(a) Property Damage. Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) Business Interruption. Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) No Representation of Adequate Coverage. Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

9.5    Insurance Policies. Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least B+, V, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancellable or subject to modification except after thirty (30) days prior written notice to Lessor. Lessee shall, at least thirty (30) days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

9.6    Waiver of Subrogation. Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein, to the extent of insurance proceeds actually received by the waiving party. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

9.7    Indemnity. Except for Lessor's or its agents' or contractors' gross negligence or willful misconduct, notwithstanding Section 8.6, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee, to the extent of insurance proceeds actually received by the waiving party. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

9.8    Exemption of Lessor from Liability. Lessor shall not be liable for injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building or which the Premises are a part, or from other sources or places. Lessor shall not be liable for any damages arising from any act or neglect of any other tenant of Lessor. Notwithstanding Lessor's negligence or breach of this Lease, Lessor shall under no circumstances be liable for injury to Lessee's business or for any loss of income or profit therefrom.

a.    Damage or Destruction.

9.1    Definitions.

(a) "Premises Partial Damage" shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in six (6) months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within thirty (30) days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b) "Premises Total Destruction" shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in six (6) months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within thirty (30) days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) "Insured Loss" shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which are caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) "Replacement Cost" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) "Hazardous Substance Condition" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises.

9.2    Partial Damage - Insured Loss. If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessee's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within ten (10) days following receipt of written notice of such shortage and request therefor. If Lessee receives said funds or adequate assurance thereof within said ten (10) day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within ten (10) days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or have this Lease terminate thirty (30) days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3    Partial Damage - Uninsured Loss. If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice, accompanied by extension of the cost to repair, if Lessor has procured same, to Lessee within thirty (30) days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective sixty (60) days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within ten (10) days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within thirty (30) days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    Total Destruction. Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate sixty (60) days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    Damage Near End of Term. If at any time during the last six (6) months of this Lease there is damage for which the cost to repair exceeds one (1) month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective sixty (60) days following the date of occurrence of such damage

Initials _____

FORM STN-2-7/97E

©1997 - American Industrial Real Estate Association

Exhibit A - 34

by giving a written termination notice to Lessor within sixty (30) days after the date of occurrence of such ... party b. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may (i) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is ten days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    Abatement of Rent; Lessee's Remedies.
(a) Abatement. In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) Remedies. If Lessor shall be obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within ninety (90) days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than sixty (60) days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within thirty (30) days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within said thirty (30) days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    Termination - Advance Payments. Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been or may then be required to be used by Lessor.

9.8    Waive Statutes. Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.    Real Property Taxes.
10.1    Definition of "Real Property Taxes." As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein, imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, but shall not include any transfer tax incurred in connection with the transfer of fee title to the Premises.

10.2
(a) Payment of Taxes. Lessee shall pay the Real Property Taxes applicable to the Premises during the term of this Lease. Subject to Paragraph 10.2(b), all such payments shall be made at least ten (10) days prior to any delinquency date. Lessee shall promptly furnish Lessor with satisfactory evidence that such taxes have been paid. If any such taxes shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such taxes shall be prorated to cover only that portion of the tax bill applicable to the period that this Lease is in effect, and Lessor shall reimburse Lessee for any overpayment after such proration. If Lessee shall fail to pay any required Real Property Taxes, Lessor shall have the right to pay the same, and Lessee shall reimburse Lessor therefor upon demand.

(b) Advance Payment. In the event Lessee incurs a late charge on any Rent payment more than once in any twelve (12) month period, Lessor may, at Lessor's option, estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee, either: (i) in a lump sum amount equal to the installment due, or at least twenty (20) days prior to the applicable delinquency date, or (ii) monthly in advance with the payment of the Base Rent. If Lessor elects to require payment monthly in advance, the monthly payment shall be such amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessee is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sums as are necessary to pay such obligations. All monies paid to Lessor under this Paragraph may be intermingled with other monies of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any balance of funds paid to Lessor under the provisions of this Paragraph may, at the option of Lessor, be treated as an additional Security Deposit.

10.3    Joint Assessment. If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4    Personal Property Taxes. Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause such property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said personal property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within ten (10) days after receipt of a written statement.

11.    Utilities. Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered.

12.    Assignment and Subletting.
12.1    Lessor's Consent Required.
(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent which consent shall not be unreasonably withheld. ... A change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of twenty-five percent (25%) or more of the voting control of Lessee shall constitute a change in control for this purpose.

(b) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than twenty-five percent (25%) of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(c) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon thirty (30) days written notice, increase the monthly Base Rent to one hundred ten percent (110%) of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to one hundred ten percent (110%) of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments schedules during the remainder of the Lease term shall be increased to One Hundred Ten Percent (110%) of the scheduled adjusted rent.

(d) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

12.2    Terms and Conditions Applicable to Assignment and Subletting.
(a) Regardless of Lessor's consent, any assignment or subletting shall not: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease; (ii) release Lessee of any obligations hereunder; or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an

detainer and a Breach of this Lease entitling L_____ to remedies provided for in this Lease and/or by a_____.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    Inducement Recapture.    Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of Rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    Late Charges.    Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within five (5) days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a one-time late charge equal to ten percent (10%) of each such overdue amount. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    Interest.    Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within thirty (30) days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or thirty-first (31st) day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be equal to the prime rate reported in the Wall Street Journal as published closest prior to the date when due plus four percent (4%), but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    Breach by Lessee.

(a) Notice of Breach.    Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than thirty (30) days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than thirty (30) days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such thirty (30) day period and thereafter diligently pursued to completion.

(b) Performance by Lessee on Behalf of Lessor.    In the event that neither Lessor nor Lender cures said breach within thirty (30) days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent an amount equal to the greater of one month's Base Rent or the Security Deposit, and to pay an excess of such expense under protest, reserving Lessee's right to reimbursement from Lessor. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    Condemnation.    If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than ten percent (10%) of any building portion of the Premises, or more than twenty-five percent (25%) of the land area portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within ten (10) days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within ten (10) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessor shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.    Brokers' Fee.

15.1    Additional Commission.    In addition to the payments owed pursuant to Paragraph 1.10 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee acquires any rights to the Premises or other premises owned by Lessor or located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule of said Brokers in effect at the time of the execution of this Lease.

15.2    Assumption of Obligations.    Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Each Broker shall be a third party beneficiary of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to a Broker any amounts due as and for commissions pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within ten (10) days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessee's Broker.

15.3    Representations and Indemnities of Broker Relationships.    Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, and/or attorneys' fees reasonably incurred with respect thereto.

16.    Estoppel Certificate.

(a) Each Party (as "Responding Party") shall within ten (10) days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the American Industrial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such ten day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there is no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's Rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including, but not limited to, Lessee's financial statements for the past three (3) years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    Definition of Lessor.    The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to

Initials _____ _____

FORM STN-8-2/97E

©1997 - American Industrial Real Estate Association

Exhibit A - 36

the transferee or assignee (in each or by credit) _____ ised Security Deposit held by Lessor. Except as _____ in Paragraph 15, upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined. Notwithstanding the above, and subject to the provisions of Paragraph 20 below, the original Lessor under this Lease, and all subsequent holders of the Lessor's interest in this Lease shall remain liable and responsible with regard to the potential duties and liabilities of Lessor pertaining to Hazardous Substances as outlined in Paragraph 8 above.

19.    Severability. The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.    Days. Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.    Limitation on Liability. Subject to the provisions of Paragraph 17 above, the obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, the individual partners of Lessor or its or their individual partners, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against the individual partners of Lessor, or its or their individual partners, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.    Time of Essence. Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.    No Prior or Other Agreements; Broker Disclaimer. This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party. The liability (including court costs and Attorneys' fees), of any Broker with respect to negotiation, execution, delivery or performance by either Lessor or Lessee under this Lease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

23.    Notices.

23.1 Notice Requirements. All notices required or permitted by this Lease shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, (followed by overnight or registered mail delivery) and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notices , except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice . A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2 Date of Notice. Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given forty-eight (48) hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given twenty-four (24) hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt, provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.    Waivers. No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

25.    Recording. Either Lessor or Lessee shall, upon request of the other, execute, acknowledge and deliver to the other a short form memorandum of this Lease for recording purposes. The Party requesting recordation shall be responsible for payment of any fees applicable thereto.

26.    No Right To Holdover. Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to one hundred fifty percent (150%) of the Base Rent applicable during the month immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.    Cumulative Remedies. No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.    Covenants and Conditions; Construction of Agreement. All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.    Binding Effect; Choice of Law. This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.    Subordination; Attornment; Non-Disturbance.

30.1 Subordination. This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lessor's Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2 Attornment. Subject to the non-disturbance provisions of Paragraph 30.3, Lessee agrees to attorn to a Lender or any other party who acquires ownership of the Premises by reason of a foreclosure of a Security Device, and that in the event of such foreclosure, such new owner shall not: (i) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (ii) be subject to any offsets or defenses which Lessee might have against any prior lessor; or (iii) be bound by prepayment of more than one (1) month's rent.

30.3 Non-Disturbance. With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within sixty (60) days after the execution of this Lease, Lessor shall use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said sixty (60) days, then Lessee may, at Lessee's option, directly contact Lessor's lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4 Self-Executing. The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from a Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    Attorneys' Fees. If any Party or Broker brings an action or proceeding involving the Premises to enforce the terms hereof or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach.

32.    Lessor's Access; Showing Premises; Repairs. Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an

Page 9 of 11
REVISED

Initials _____

FORM STN-4-2/7E

Exhibit A - 37

emergency, and otherwise at reasonable time, _____ Lessor as Lessee provided that Lessee's represents _____ at all times have the right to accompany Lessor's representative, for the purpose of showing the same to prospective purchasers, lenders, or Lessees, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary. All such activities shall be without abatement of rent or liability to Lessee. Lessor may at any time place on the Premises any ordinary "For Sale" signs and Lessor may during the last six (6) months of the term hereof place on the Premises any ordinary "For Lease" signs. Lessee may at any time place on or about the Premises any ordinary "For Sublease" sign.

33.    Auctions. Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.    Signs. Except for ordinary "For Sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.    Termination; Merger. Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within ten (10) days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.    Consents. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including, but not limited to, architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including, but not limited to, consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within ten (10) business days following such request.

37.    Guarantor.

37.1    Execution. The Guarantors, if any, shall each execute a guaranty in the form most recently published by the American Industrial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2    Default. It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) a Tenancy Statement, or (d) written confirmation that the guaranty is still in effect.

38.    Quiet Possession. Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under the Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.    Options.

39.1    Definition. "Option" shall mean: (a) the right to extend the term of or renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2    Options Personal To Original Lessee. Each Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3    Multiple Options. In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4    Effect of Default on Options.

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given three (3) or more notices of separate Default, whether or not the Defaults are cured, during the twelve (12) month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term, (i) Lessee fails to pay Rent for a period of thirty (30) days after such Rent becomes due (without any necessity of Lessor to give notice thereof), (ii) Lessor gives to Lessee three (3) or more notices of separate Default during any twelve (12) month period, whether or not the Defaults are cured, or (iii) if Lessee commits a Breach of this Lease.

40.    Multiple Buildings. If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will observe all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and that Lessee will pay its fair share of common expenses incurred in connection therewith.

41.    Security Measures. Lessee hereby acknowledges that the rental payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.    Reservations. Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.    Performance Under Protest. If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.

44.    Authority. If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within thirty (30) days after request, deliver to the other Party satisfactory evidence of such authority.

45.    Conflict. Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.    Offer. Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.    Amendments. This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.    Multiple Parties. If more than one person or entity is named herein as either Lessor or Lessee, such multiple Parties shall have joint and several responsibility to comply with the terms of this Lease.

49.    Mediation and Arbitration of Disputes. An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is, ☒ is not attached to this Lease.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME

Initials ____

FORM STN-9-4/97E

©1997 - American Industrial Real Estate Association

Exhibit A - 38

THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING: IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at Los Angeles, CA
on:
By LESSOR:

Namco Capital Group, Inc.

By:

Name Printed: Ezri Namvar

Title: President

By:
Name Printed:
Title:
Address: 11943 Montana Ave., Suite 100,
Los Angeles, CA 90049

Telephone: (310) 207-1000
Facsimile: (310) 207-6308
Federal ID No.

---

Executed at: Houston, Texas
on: January 25, 1999
By LESSEE:

Loomis, Fargo & Co., a Texas corporation

By:

Name Printed: James K. Jennings, Jr.

Title: Executive Vice President & CFO

By:
Name Printed:
Title:
Address: Staubach Portfolio Services Attn:
Loomis, Fargo & Co. Lease Admin.
6750 LBJ Freeway, Suite 1100
Dallas, TX 75240
w/copy to: Chief Financial Officer
Loomis, Fargo & Co.
2800 City West Blvd., Suite 800
Houston, TX 77042

Telephone: (713) 435-6766
Facsimile: (713) 435-6926
Federal ID No. 75-0117200

NOTE: These forms are often modified to meet the changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION, 700 So. Flower Street, Suite 600, Los Angeles, California 90017, (213) 687-8777. Fax No. (213) 687-8616

FORM STN-8-9/97E

©1997 - American Industrial Real Estate Association

Exhibit A - 39



# RENT ADJUSTMENT(S)

### STANDARD LEASE ADDENDUM

Dated January 14 , 1998

By and Between (Lessor) Namco Capital Group, Inc.

(Lessee) Loomis, Fargo & Co.

Address of Premises: 1029 W. Pico Blvd.
Los Angeles, CA

Paragraph

**A. RENT ADJUSTMENTS:**
The monthly rent for each month of the adjustment period(s) specified below shall be increased using the method(s) indicated below:

(Check Method(s) to be Used and Fill in Appropriately)

☒ I. Cost of Living Adjustment(s) (COLA)

   a. On (Fill in COLA Dates): First day of each calendar year

the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☒ CPI U (All Urban Consumers), for (Fill in Urban Area):

Los Angeles - Anaheim - Riverside , All Items
(1982-1984 = 100), herein referred to as "CPI".

   b. The monthly rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month two months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is two months prior to (select one): ☒ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill in Other "Base Month"): . The sum so calculated shall constitute the new monthly rent hereunder, but in no event, shall any such new monthly rent be less than the rent payable for the month immediately preceding the rent adjustment.

   c. In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the Parties. The cost of said Arbitration shall be paid equally by the Parties.

☐ II. Market Rental Value Adjustment(s) (MRV)

   a. On (Fill in MRV Adjustment Date(s):

the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

   1) Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached within thirty days, then:

      (a) Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next thirty days. Any associated costs will be split equally between the Parties, or

      (b) Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

         (i) Within fifteen days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

         (ii) The Three arbitrators shall within thirty days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

         (iii) If either of the Parties fails to appoint an arbitrator within the specified fifteen days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

         (iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

   2) Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.

   b. Upon the establishment of each New Market Rental Value:

Initials: _____          Initials: _____

**RENT ADJUSTMENTS**
Page 1 of 2

1) the new MRV will become the new "Base Rent" for the purpose of calculating any further ... ments, and
2) the first month of each Market Rental Value term shall become the new 'Base Month' for the purpose of calculating any further Adjustments.

☐ III.    Fixed Rental Adjustment(s) (FRA)

The Base Rent shall be increased to the following amounts on the dates set forth below:

On (Fill in FRA Adjustment Date(s)):         The New Base Rent shall be:

_____    $ _____
_____    $ _____
_____    $ _____
_____    $ _____

B.    NOTICE:
Unless specified otherwise herein, notice of any such adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C.    BROKER'S FEE:
The Brokers specified in paragraph 1.10 shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

Initials: _____    Initials: _____

RENT ADJUSTMENTS
Page 2 of 2

For this form, write: American Industrial Real Estate Association, 700 S. Flower Street, Suite 600, Los Angeles, Calif. 90017
REVISED
©1997 - American Industrial Real Estate Association                    FORM RA-2-3/97E

Exhibit A - 41

## ADDENDUM TO LEASE

THIS ADDENDUM TO LEASE (this "Addendum") is attached to and incorporated in that certain Standard Industrial/Commercial Single Tenant Lease-Net dated as of January 14, 1999 (the "Lease") between Namco Capital Group, Inc. ("Lessor") and Loomis, Fargo & Co. ("Lessee"). The provisions of this Addendum shall control over the provisions of the form Lease in the event of any conflict. All references in this Addendum to the "Lease" shall be deemed to include this Addendum unless the context requires otherwise. The following provisions are incorporated in the Lease:

1.        SUBJECT TO COMPLETION OF THE LESSOR'S WORK (AS DEFINED BELOW), LESSEE HEREBY ACKNOWLEDGES AND AGREES THAT THE LEASE OF THE PREMISES HEREUNDER IS AND WILL BE MADE ON AN "AS IS, WHERE IS" BASIS AND THAT NEITHER LESSOR, NOR ANY ATTORNEY, REPRESENTATIVE, AGENT OR EMPLOYEE OF LESSOR HAS MADE, OR WILL MAKE, AND, EXCEPT AS EXPRESSLY SET FORTH IN THIS LEASE, LESSOR SPECIFICALLY NEGATES AND DISCLAIMS, ANY REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, FUTURE OR OTHERWISE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PREMISES, INCLUDING, WITHOUT LIMITATION, (1) ENVIRONMENTAL MATTERS RELATING TO THE PREMISES OR ANY PORTION THEREOF, (2) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND FAULTING, (3) WHETHER OR NOT AND TO THE EXTENT TO WHICH THE PREMISES OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD, (4) DRAINAGE, (5) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDE, OR THE SUFFICIENCY OF ANY UNDERSHORING, (6) ZONING, AND OTHER RESTRICTIONS IMPOSED BY ANY GOVERNMENTAL AGENCY OR AUTHORITY, OF ANY KIND WHATSOEVER, TO WHICH THE PREMISES OR ANY PORTION THEREOF MAY BE SUBJECT, (7) THE AVAILABILITY OF ANY UTILITIES TO THE PREMISES OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, WATER, SEWAGE, GAS AND ELECTRIC, (8) USAGES OF ADJOINING PREMISES, (9) ACCESS TO THE PREMISES OR ANY PORTION THEREOF, (10) THE VALUE, SIZE, LOCATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE PREMISES, ANY IMPROVEMENTS ON THE PREMISES, OR ANY PORTION THEREOF, OR ANY LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE PREMISES OR ANY PART THEREOF, (11) THE PRESENCE OF HAZARDOUS MATERIALS IN OR ON, UNDER OR IN THE VICINITY OF THE PREMISES, (12) THE

CONDITION OR USE OF THE PREMISES OR COMPLIANCE OF THE PREMISES
WITH ANY OR ALL PAST, PRESENT OR FUTURE FEDERAL, STATE OR LOCAL
ORDINANCE, RULES, REGULATIONS OR LAWS, BUILDING, FIRE OR ZONING
ORDINANCES, CODES OR OTHER SIMILAR LAWS, (13) THE EXISTENCE OR
NON-EXISTENCE OF UNDERGROUND STORAGE TANKS, (14) ANY MATTER
AFFECTING THE STABILITY OR INTEGRITY OF THE LAND OR
IMPROVEMENTS, (15) THE POTENTIAL FOR DEVELOPMENT OF THE
PREMISES, (16) THE EXISTENCE OF VESTED LAND USE, ZONING OR
BUILDING ENTITLEMENTS AFFECTING THE PREMISES, (17) THE
MERCHANTABILITY OF THE PREMISES OR FITNESS OF THE PREMISES FOR
ANY PARTICULAR PURPOSE (LESSEE AFFIRMING THAT LESSEE HAS NOT
RELIED ON LESSOR'S SKILL OR JUDGMENT TO SELECT OR FURNISH THE
PREMISES FOR ANY PARTICULAR PURPOSE, AND THAT LESSOR MAKES NO
WARRANTY THAT THE PREMISES IS FIT FOR ANY PARTICULAR PURPOSE),
OR (18) WHETHER THE PREMISES ARE IN COMPLIANCE WITH APPLICABLE
LAWS, REGULATIONS, ORDINANCES AND CODES. LESSEE
ACKNOWLEDGES THAT IT HAS BEEN IN POSSESSION AND OCCUPANCY OF
THE PREMISES FOR SEVERAL YEARS AND THAT IT HAS COMPLETED ALL
PHYSICAL, FINANCIAL REGULATORY AND OTHER STUDIES, ANALYSES
AND EXAMINATIONS RELATING TO THE LEASE OF THE PREMISES
HEREUNDER AND WILL LEASE THE SAME SOLELY ON THE BASIS OF SUCH
STUDIES, ANALYSES AND EXAMINATIONS AND NOT ON ANY
INFORMATION PROVIDED OR TO BE PROVIDED BY LESSOR. LESSOR SHALL
NOT BE LIABLE FOR ANY NEGLIGENT MISREPRESENTATION OR ANY
FAILURE BY LESSEE TO INVESTIGATE THE PREMISES AND ALL MATTERS
RELATED THERETO, NOR SHALL LESSOR BE BOUND IN ANY MANNER BY
ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS,
APPRAISALS, ENVIRONMENTAL ASSESSMENT REPORTS, OR OTHER
INFORMATION PERTAINING TO THE PREMISES OR THE OPERATION
THEREOF, FURNISHED BY LESSOR OR BY ANY REAL ESTATE BROKER,
AGENT, REPRESENTATIVE, EMPLOYEE, OR OTHER PERSON ACTING ON
LESSOR'S BEHALF, EXCEPT FOR EXPRESS WRITTEN REPRESENTATIONS
SIGNED BY LESSOR WHICH ARE EXPLICITLY ADDRESSED TO LESSEE. IT IS
UNDERSTOOD AND AGREED THAT THE PREMISES IS LEASED BY LESSOR
TO LESSEE SUBJECT TO THE FOREGOING.

2.      For purposes of this Lease, the term "Commencement Date" shall mean
the date which is thirty (30) days after completion of the Lessor's Work, and the term
"Expiration Date" shall mean the date which is fifteen (15) years after the
Commencement Date. If requested by Lessor, after completion of the Lessor's Work,
Lessee shall promptly execute and deliver a memorandum setting forth with specificity
the Commencement Date and the Expiration Date.

3.      Notwithstanding Paragraph 2.3 of the Lease, in the event that Capital
Expenditures are necessitated by or required in connection with an event of damage or

destruction which (a) is not an Insured Loss, or (b) which Lessee is not required to insure under the Lease, or (c) results from the negligence or willful act of Lessee or its invitees (in which event Lessee shall be responsible for paying for such Capital Expenditures), Lessor may either (x) proceed with the Capital Expenditures as soon as reasonably possible at its own expense, in which event this Lease will remain in full force and effect, or (y) notify Lessee of Lessor's intent to terminate the Lease in accordance with Paragraph 9.3.

4.    In connection with the execution of this Lease, Lessor shall, at Lessor's sole cost and expense, promptly after execution of this Lease, retain qualified licensed contractors, architects and/or engineers, procure the necessary permits and complete the following (collectively the "Lessor's Work") at the Premises:

1. Structural alterations necessary to bring the Premises into compliance with Los Angeles Municipal Codes including, but not limited to ordinance numbers 169341 and 170605, relating to the seismic strengthening of tilt-up concrete wall buildings.

2. Removal and disposal of existing roof. Replace all flashing and install a built-up roof system that has a minimum five-year warranty on labor and fifteen (15) year warranty on materials.

3. Remove all existing air conditioning equipment and install all platforms, electrical, plumbing and gas connections, thermostats, and smoke detectors necessary to tie-in 9 new units to existing supply and return ducts. Units will be of sufficient capacity to comfortably heat and cool the Premises. All units will have a minimum 1-year warranty on parts and labor with five (5) years on the compressor.

4. Replace fresh air exhaust system in the garage area of the Premises. System will be of sufficient cubic feet per minute to adequately ventilate truck exhaust fumes from Lessee's operations.

5. Install one or more swamp coolers or other comparable evaporative type coolers to adequately cool the garage area of the Premises.

6. Repair potholes and deficient parking lot conditions. Prepare surface and apply 1.5" asphalt surface coat.

7. Install automatic gate opener hardwired to the control room of the Premises.

8. Conduct electrical repairs, replace bulbs and ballasts necessary to bring all interior fluorescent light fixtures into proper working order. Replace all damaged interior fixtures. Install new high-pressure sodium fixtures to illuminate West and North perimeter areas of the Premises. Replace exterior fixtures on south and east sides of building with high-pressure sodium fixtures that properly illuminate parking and perimeter areas of the Premises.

9. Install 40-ounce commercial grade carpet in downstairs area of the building. Paint entire area.

10. Upstairs office area - Replace drop-in ceiling tiles and repair or replace damaged grid. Remove existing floor tile in hallway and replace with

Exhibit A - 44

appropriate commercial-grade vinyl floor tile.   Install new 40 ounce commercial grade carpet in all areas, paint offices and hallways.

All of the Lessor's Work shall be performed in a workmanlike fashion using standard industrial materials, and shall be completed in a manner which is in compliance with applicable laws. Lessee shall have the right to appoint a representative to meet with Lessor and its contractor during the performance of the Lessor's Work to keep abreast of the progress thereof, and to make suggestions as to any details which will materially impact Lessee's use of the Premises and its obligations under the Lease. Lessor shall use good faith efforts to integrate any such suggestions, provided that Lessor will not incur material additional cost, expense or delay in connection therewith. After completion of the Lessor's Work, Lessee shall be responsible for the repair and maintenance of all elements of the Premises, as set forth in the Lease, provided that Lessor shall assign to Lessee, to the extent required by Lessee for the assertion of the benefits thereof in connection with a matter for which Lessee would be responsible under this Lease, any construction warranties and/or guaranties provided by Lessor's contractor(s) with respect to the Lessor's Work.

IN WITNESS WHEREOF, this Addendum has been executed concurrent with the Lease.

NAMCO CAPITAL GROUP, INC.

By: _____
Ezri Namvar

LOOMIS FARGO & CO.

By: _____
Name: James R. Jennings, Jr.

| In re:<br>NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 2:08-bk-32333-BR |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

1900 Avenue of the Stars, Seventh Floor, Los Angeles, California 90067-4308

A true and correct copy of the foregoing document described **NOTICE OF MOTION AND MOTION OF BRADLEY D. SHARP, CHAPTER 11 TRUSTEE FOR THE ESTATE OF NAMCO CAPITAL GROUP, INC., FOR ORDER AUTHORIZING ASSUMPTION AND ASSIGNMENT OF REAL PROPERTY LEASE, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES [1929 PICO BOULEVARD]; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF BRADLEY D. SHARP**; will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On April 21, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served):**
On April 21, 2010 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 21, 2010 | Billie Terry | _Billie T_ |
|---|---|---|
| Date | Type Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re:<br>NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 2:08-bk-32333-BR |
|---|---|

## ADDITIONAL SERVICE INFORMATION:

## I. TO BE SERVED BY NEF

- Simon Aron   saron@wrslawyers.com
- Raymond H Aver   ray@averlaw.com
- Robert D Bass   rbass@greenbass.com
- Christine E Baur   christine.e.baur@bakernet.com, tracey.l.angelopoulos@bakernet.com;anne.w.hamann@bakernet.com;ali.m.m.mojdehi@bakernet.com;jane.b.mackie@bakernet.com
- Michael Jay Berger   michael.berger@bankruptcypower.com, michael.berger@bankruptcypower.com;cristina.frankian@bankruptcypower.com
- Stephen F Biegenzahn   efile@sfblaw.com
- J Scott Bovitz   bovitz@bovitz-spitzer.com
- Gillian N Brown   gbrown@pszjlaw.com, gbrown@pszjlaw.com
- Shirley Cho   scho@pszjlaw.com
- Matthew Clarke   mclarke@cappellonoel.com
- Russell Clementson   russell.clementson@usdoj.gov
- Alicia Clough   alicia.clough@kayescholer.com
- Marc S Cohen   mcohen@kayescholer.com
- Yona Conzevoy   yconzevoy@dwclaw.com
- Ashleigh A Danker   adanker@kayescholer.com
- Brian L Davidoff   bdavidoff@rutterhobbs.com, calendar@rutterhobbs.com;jreinglass@rutterhobbs.com
- Melissa Davis   mdavis@shbllp.com
- Daniel Denny   ddenny@gibsondunn.com
- Richard K Diamond   rdiamond@dgdk.com
- Richard K Diamond   jlv@dgdk.com, rdiamond@ecf.epiqsystems.com
- Caroline Djang   crd@jmbm.com
- Joseph A Eisenberg   jae@jmbm.com
- Joseph A Eisenberg   jeisenberg@jmbm.com
- Robert Esensten   resensten@wcclaw.com
- Michael G Fletcher   mfletcher@frandzel.com, efiling@frandzel.com;shom@frandzel.com
- Alan W Forsley   awf@fredmanlieberman.com, awf@fkllawfirm.com
- Heather Fowler   heather.fowler@lw.com, colleen.rico@lw.com
- Jon H Freis   jon@jhfreis.net
- Sandford Frey   Sfrey@cmkllp.com
- Vanessa B Fung   vfung@sobini.com
- Philip A Gasteier   pag@lnbrb.com
- Randi R Geffner   rgeffner@wcclaw.com
- Thomas M Geher   tmg@jmbm.com
- Barry S Glaser   bglaser@swjlaw.com
- Steven Glaser   sglaser@wwllp.com
- Jeffrey I Golden   jgolden@wgllp.com
- David Gould   dgould@davidgouldlaw.com
- Steven T Gubner   sgubner@ebg-law.com, ecf@ebg-law.com
- M Jonathan Hayes   jhayes@polarisnet.net
- Jeffery D Hermann   jhermann@orrick.com
- Michael J Heyman   michael.heyman@klgates.com
- Eric P Israel   eisrael@dgdk.com
- Seymone Javaherian   sj@javlaw.com
- Ira Benjamin Katz   Ikatz@katzlaw.net
- George H Kim   george@gkimlaw.com
- Stuart I Koenig   Skoenig@cmkllp.com
- Michael S Kogan   mkogan@ecjlaw.com
- John P Kreis   jkreis@attglobal.net
- Jeffrey A Krieger   jkrieger@ggfirm.com
- Duane Kumagai   dkumagai@rutterhobbs.com, calendar@rutterhobbs.com
- Steven N Kurtz   lgreenstein@laklawyers.com, rfeldon@laklawyers.com
- Pamela Labruyere   pamela@sgsslaw.com
- Ronald L Leibow   rleibow@kayescholer.com
- Jennifer Leland   jleland@pwkllp.com
- John T Madden   jmadden@wgllp.com
- Harris M Madnick   hmmadnick@reederlugreen.com
- William Malcolm   bill@mclaw.org
- Elmer D Martin   elmermartin@msn.com
- Daniel J McCarthy   dmccarthy@hillfarrer.com
- David W. Meadows   david@davidwmeadowslaw.com
- Hal M Mersel   mark.mersel@bryancave.com
- Elissa Miller   emiller@sulmeyerlaw.com
- Ali M Mojdehi   ali.m.m.mojdehi@bakernet.com, andrew.mcdermott@bakernet.com;brian.byun@bakermckenzie.com
- Susan I Montgomery   susan@simontgomerylaw.com
- Monserrat Morales   mmorales@pwkllp.com
- Randall P Mroczynski   randym@cookseylaw.com
- Vicente Matias Murrell   murrell.vicente@pbgc.gov
- R. Todd Neilson   tneilson@ecf.epiqsystems.com, vdoran@lecg.com;sgreenan@lecg.com
- David Norouzi   david@norouzi.us
- Scott H Noskin   snoskin@mirmanbubman.com
- William Novotny   william.novotny@mwmf.com
- Walter K Oetzell   woetzell@dgdk.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                                    F 9013-3.1

| In re:<br>NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER  2:08-bk-32333-BR |
|---|---|

## ADDITIONAL SERVICE INFORMATION:

### I. TO BE SERVED BY NEF

- Sam S Oh    sam.oh@limruger.com, julie.yu@limruger.com;amy.lee@limruger.com
- Aram Ordubegian    ordubegian.aram@arentfox.com
- Jenny Y Park Garner    jpark@sheppardmullin.com
- Penelope Parmes    pparmes@rutan.com
- Lawrence Peitzman    lpeitzman@pwkllp.com
- Leo D Plotkin    lplotkin@lsl-la.com, dsmall@lsl-la.com
- David M Poitras    dpoitras@jmbm.com
- Samuel Price    sprice@donahoeyoung.com
- Uzzi O Raanan    uor@dgdk.com
- Christopher S Reeder    creeder@reederlugreen.com
- Jeremy E Rosenthal    jrosenthal@sidley.com
- Gregory M Salvato    gsalvato@pmcos.com, calendar@pmcos.com
- Bruce S Schildkraut    bruce.schildkraut@usdoj.gov
- Benjamin Seigel    bseigel@buchalter.com, IFS_filing@buchalter.com
- David B Shemano    dshemano@pwkllp.com
- Brian P Simon    nightowl5755@yahoo.com
- Robyn B Sokol    ecf@ebg-law.com, rsokol@ebg-law.com
- Ryan J Stonerock    rstonerock@wrslawyers.com
- Nico N Tabibi    nico@tabibilaw.com
- Sam Tabibian    sam.tabibian@gmail.com
- Derrick Talerico    dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;marcycarman@tilemlaw.com;ldiaz@tilemlaw.com;dianachau@tilemlaw.com; kmishigian@tilemlaw.com
- Alan G Tippie    atippie@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Howard J Weg    hweg@pwkllp.com
- Michael H Weiss    mw@weissandspees.com, lm@weissandspees.com;jb@weissandspees.com
- Monika S Wiener    wienerm@hbdlawyers.com
- Kimberly S Winick    kwinick@clarktrev.com
- Rebecca J Winthrop    winthropr@ballardspahr.com
- Beth Ann R Young    bry@lnbrb.com
- Mark T Young    myoung@donahoeyoung.com
- Afshin Youssefyeh    ady@adylaw.com

### II. SERVED BY OVERNIGHT MAIL

Honorable Barry Russell
United States Bankruptcy Court
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

### II. SERVED BY U.S. MAIL

| Curtin Meighan<br>Operations Manager<br>1929 Pico Blvd.<br>Los Angeles, CA 90067 | Brian F. Steelman<br>Account Manager<br>Jones Lang LaSalle<br>2500 Citywest Blvd., Suite 900<br>Houston, TX 77042 |
|---|---|

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*    **F 9013-3.1**

| In re:<br>NAMCO CAPITAL GROUP, INC.<br><br>                                                Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 2:08-bk-32333-BR |
|---|---|

## ADDITIONAL SERVICE INFORMATION:

## II. SERVED BY U.S. MAIL

### ASSIGNEES

| | |
|---|---|
| Maryam Pirian<br>c/o Gregory M. Salvato, Esq.<br>Parker, Miliken, Clark ,O'Hara & Samuelian<br>555 S. Flower St.<br>Los Angeles, CA  90071-2440 | Maryam Pirian, Trustee of the MMP Family Trust<br>c/o Gregory M. Salvato, Esq.<br>Parker, Miliken, Clark, O'Hara & Samuelian<br>555 S. Flower St.<br>Los Angeles, CA  90071-2440 |
| Pirian, Maryam & Manoucher and Naim, Mehrdad<br>Nahal Pirian, Joseph Pirian<br>c/o Parker Miliken Clark O'Hara<br>555 S. Flower Street, 30th Fl.<br>Los Angeles, CA  90071-2440 | Fereshteh Kohanim<br>c/o Fredman Lieberman, LLP<br>1875 Century Park East, #2200<br>Los Angeles, CA  90067 |
| Soleiman Israel Naim<br>c/o Marc Lieberman Esq<br>Fredman Lieberman LLP<br>1875 Century Park East, #2200<br>Los Angeles, CA  90067 | Mehrdad Naim<br>1849 S. Bentley Ave., #201<br>Los Angeles, CA  90025<br>Joseph Pirian<br>Parker, Miliken, Clark, O'Hara & Samuelian<br>555 S. Flower St.<br>Los Angeles, CA  90071-2440 |
| Nahal Pirian<br>Parker, Miliken, Clark, O'Hara & Samuelian<br>555 S. Flower St.<br>Los Angeles, CA  90071-2440 | MMP Family Trust<br>Maryam Pirian<br>130 N. Carmelina St.<br>Los Angeles, CA 90049 |
| Moosai Revocable Family Trust<br>304 N. Foothill Rd.<br>Beverly Hills, CA 90210 | Manouchehr Pirian<br>130 N. Carmelina St.<br>Los Angeles, CA 90049 |
| Maryam Pirian as Trustee of MMP Family Trust<br>130 N. Carmelina St.<br>Los Angeles, CA 90049 | Mehrdad Naim<br>1849 S. Bentley Ave., #201<br>Los Angeles, CA  90025 |
| Joseph Pirian & Nehal Pirian<br>130 N. Carmelina St.<br>Los Angeles, CA 90049 | Joseph Pirian<br>130 N. Carmelina St.<br>Los Angeles, CA 90049 |
| Fereshteh Kohanim<br>11710 Barrington Ct.<br>Los Angeles, CA 90049 | Soleiman Israel Naim<br>403 21st St.<br>Santa Monica, CA 90402 |
| Namco Financial, Inc.<br>c/o R. Todd Neilson<br>LECG<br>2049 Century Park East, Suite 2300<br>Los Angeles, CA 90067 | |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                      **F 9013-3.1**